FILED

MAR - 1 2006

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |  |
|---|---|---|
| JONELLE DRAPEAU, | * | CIV 04-4091 |
| Plaintiff, | * | |
| | * | MEMORANDUM OPINION |
| -vs- | * | AND ORDER |
| THE UNITED STATES OF AMERICA; and DEPARTMENT OF THE INTERIOR BUREAU OF INDIAN AFFAIRS, | * | |
| Defendants. | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Defendants filed a Motion for Summary Judgment, Doc. 38, and Plaintiff filed a Motion for Partial Summary Judgment, Doc. 34. The motions have been fully briefed and the Court heard oral argument on the motions relating to Count One of the Plaintiff's Complaint. For the reasons set forth below, Defendants' motion will be granted and Plaintiff's motion will be denied.

## BACKGROUND

Plaintiff brings this action pursuant to the Federal Tort Claims Act, for invasion of privacy, and she also seeks to recover damages under the Privacy Act for disclosure of information concerning her termination from the basic 16-week Bureau of Indian Affairs ("BIA") law enforcement course conducted at the Indian Police Academy ("the Academy") in Artesia, New Mexico. Defendants seek summary judgment in their favor on all of Plaintiff's claims in this action. Plaintiff seeks summary judgment on the issue of liability in this action.

In evaluating Defendants' summary judgment motion, the Court will view the facts in the light most favorable to Plaintiff as the non-moving party. Plaintiff first worked in law enforcement for the Lake Andes police department in Lake Andes, South Dakota. During that time, she attended a 10-week training at the South Dakota Police Academy. After completing this training, Plaintiff

began working for the Wagner, South Dakota, police department. In September 2000, Plaintiff began working as a uniformed police officer for the BIA.

On January 6, 2003, Plaintiff began her training course at the Academy. Her expected graduation date was April 25, 2003. On February 24, 2003, however, Plaintiff was dismissed from the Academy for rules violations.

The events resulting in Plaintiff's dismissal began on Friday, February 21, 2003, when several cadets, including Plaintiff, left the Academy on an authorized trip to a local restaurant and then to a bar. Plaintiff drank a couple of mixed drinks and danced with Cadet Rodney Vincent who was also drinking alcohol. While at the bar, Plaintiff and Vincent kissed. The cadets left the bar at approximately 1:30 a.m. and returned to the Academy. Upon returning to the Academy, Vincent invited Plaintiff to his room and Plaintiff accepted although they both knew it was a violation of the Academy's rules for Plaintiff to be in Vincent's room. The Academy's Standards of Conduct II(B)10 provides that, "Cadets will not enter individual rooms of members of the opposite sex."

As Plaintiff and Vincent were walking to Vincent's room, two Academy training sergeants saw them. After entering Vincent's room, Plaintiff and Vincent began to kiss again. Within a few minutes, they heard officers knocking on other cadets' doors and they both realized the officers were looking for them. Plaintiff wanted to open the door for the officers, but Vincent pulled her back from the door. He told her to hide under the bed, but she refused. He then asked her to hide in his locker. She agreed to hide in the locker even though it was very small and he had to help her into the locker. Vincent messed up the bedding on his bed and removed his outer clothing before the officers arrived at his door. When the officers knocked on his door, he opened it and told them he had been sleeping. The officers searched the room and found Plaintiff hiding in the locker. Vincent and Plaintiff admitted their misconduct and pled to not be dismissed from the Academy.

Similar to prior instances by others of this type of misconduct, Plaintiff and Vincent were dismissed from the Academy. This dismissal precluded Plaintiff from reentering the Academy in

the future. Before leaving the Academy, Plaintiff contacted two Yankton BIA officials. On Sunday, February 23, 2003, she telephoned Gerald Farmer, the chief of police, and informed him she was dismissed from the Academy because she broke some rules and she would be returning to South Dakota. Farmer was detailed to another assignment at the time, so O.J. del Campo was the acting chief of police. On Monday, February 24, 2003, Plaintiff delivered a similar message to del Campo.

On February 24, 2003, Plaintiff flew from New Mexico to Sioux Falls. Her longtime boyfriend, John Provost, met her at the airport. She and Provost lived together outside of Wagner with several of their children. Plaintiff informed Provost she was dismissed from the Academy because of a rules violation, but she did not explain what rules she has violated. At first, Provost did not press her for an explanation. On Tuesday, February 25, 2003, Plaintiff stayed home rather than going to the BIA police office. On Wednesday, February 26, 2003, Plaintiff did report for duty and del Campo told her to return to patrol duty.

After Plaintiff's return to Wagner, another BIA police officer, Officer Starr, asked John Sully why Plaintiff was home earlier than expected from the Academy. Sully was a tribal contract officer who reviewed tribal contracts, but he was not on the Business and Claims Committee, the Yankton Sioux Tribe's tribal council. He was not a BIA employee. Starr asked Sully to find out what happened, and she gave Sully a telephone number to call to make this inquiry. There has been no showing that Starr had any official business reason for making her inquiry.

On February 26, 2003, Sully telephoned the Academy and spoke to Tom Woolworth, Chief of Training at the Academy. There is a dispute about who Sully represented himself to be. Sully testified he clearly identified himself as a tribal contracting officer, but Woolworth testified he believed Sully was a BIA contracting officer. In any event, Woolworth spoke to Sully but Woolworth did not have any significant personal knowledge of the reasons for Plaintiff's dismissal because Woolworth had been traveling during the weekend the relevant events occurred. Thus, while talking with Sully, Woolworth asked BIA Special Agent Mark Decoteau to help answer Sully's question. Decoteau was near Woolworth's office when Sully called. Before Sully called the

3

Academy, Decoteau had received a verbal report about the incident from Training Sergeant Travis LeBeaux, who was one of the officers that found Plaintiff in Vincent's room. Decoteau did not review any reports that may have been filed about the incident before relaying the information relating to Plaintiff's dismissal to Sully, with Woolworth's authorization. Decoteau informed Sully that Plaintiff had been dismissed because she was found in a male cadet's room late at night in violation of the Academy's rules. Woolworth did not review any documents before speaking with Sully or having Decoteau speak with Sully regarding the reasons for Plaintiff's dismissal.

After speaking with Woolworth and Decoteau, Sully told three other people about the information he received about Plaintiff's dismissal from the Academy. He told del Campo, who was already aware of Plaintiff's dismissal. He also told the Yankton Sioux Tribe's Chairperson, Madonna Archambeau, and Timothy Lake, BIA Superintendent for the Yankton agency.

On February 28, 2003, Provost located and read several e-mails that Plaintiff had sent and received from various men at the Academy. After reading the e-mails, Provost asked Plaintiff if she had been unfaithful to him. She first denied being unfaithful, but when Provost confronted her with the e-mails, she admitted to cheating on him with two men, Eugene and Brian. When he asked her what she wanted to do, she said she didn't know. He then asked her to leave the house. So Plaintiff left their house and went to stay with a friend. She never returned to the house to live with Provost and the children.

Plaintiff contends that as a result of the information given by Woolworth and Decoteau to Sully, rumors began to spread on the Yankton Sioux Reservation and caused her boyfriend to throw her out of their home. In addition, she alleged she received telephone calls asking her about what happened and threats were made to have her terminated from the BIA. Plaintiff was not terminated from the BIA police force, but she was placed on clerical duty rather than patrol duty. Being assigned to clerical duty resulted in a dramatic decrease in Plaintiff's income because she no longer had overtime, holiday and Sunday hours available and was not given night shift premiums that are

available while on patrol duty. Eventually, Plaintiff decided to leave the police force and accepted a position as a Social Services Assistant, which is a clerical position involving filing documents.

The e-mails between Plaintiff and Brian and Eugene were brought to the attention of officers at the Academy. Provost sent a letter with the e-mails attached to the BIA Area Office in Aberdeen, South Dakota. This lead to an internal investigation of Brian, who was a training sergeant at the Academy. Plaintiff was flown to the Academy for an interview regarding Brian.

Count One of the Complaint alleges that Defendant United States is liable pursuant to the Federal Tort Claims Act for an invasion of privacy based upon Woolworth's disclosure to Sully of information regarding Plaintiff's dismissal from the Academy. Count Two of the Complaint is brought against the BIA for a Privacy Act violation based upon the unauthorized publication of Plaintiff's dismissal from the Academy.

## DISCUSSION

Summary judgment is appropriate if the moving party establishes that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 256 (1986). In reviewing a motion for summary judgment, this Court views the evidence in a light most favorable to the non-moving party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970). "Once the motion for summary judgment is made and supported, it places an affirmative burden on the non-moving party to go beyond the pleadings and 'by affidavit or otherwise' designate 'specific facts showing that there is a genuine issue for trial.'" *Commercial Union Ins. Co. v. Schmidt*, 967 F.2d 270, 271 (8th Cir. 1992) (quoting Fed.R.Civ.P. 56(e)).

## I.     Federal Tort Claims Act - Invasion of Privacy

The first claim in Plaintiff's complaint is that Woolworth violated her right of privacy by disclosing to Sully information that Plaintiff was dismissed from the Academy for being caught in a male cadet's room, which was a violation of the Academy's rules. "The Federal Tort Claims Act

5

is a limited waiver of sovereign immunity, making the Federal Government liable to the same extent as a private party for certain torts of federal employees acting within the scope of their employment." *United States v. Orleans*, 425 U.S. 807, 813 (1976). Plaintiff's claims against the United States are brought pursuant to the Federal Tort Claims Act, ("FTCA"), which provides that "[t]he United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages." 28 U.S.C. § 2674.

When a claim is brought under the FTCA, the law of the state where the alleged wrongful act occurred is used to define the elements of the tort allegedly committed by a federal employee. *See Washington v. Drug Enforcement Admin.*, 183 F.3d 868, 873 (8th Cir. 1999) (stating that the applicable law under the Federal Tort Claims Act is the substantive law of the state where the wrongful conduct occurred). The parties agree that New Mexico law defines the elements of the tort of invasion of privacy in this case because the publication of the information relating to Plaintiff's dismissal occurred in New Mexico. New Mexico recognizes the tort of invasion of privacy and there are four categories into which this tort may be divided: (1) false light invasion of privacy (placing another in a false light in the public eye); (2) intrusion (invasion of the plaintiff's "private" space or solitude); (3) publication of private facts (publication of a true but intimate or private fact about the plaintiff); (4) the right of publicity or appropriation (exploitation of the plaintiff's name or likeness, usually for commercial gain). *See Moore v. Sun Publ'g Corp.*, 881 P.2d 735, 743 (N.M.App. 1994). Although Plaintiff does not identify in her complaint which of these four categories her claim falls under, it appears the only applicable one is the third category for publication of private facts.

The elements of public disclosure of private facts are: "public disclosure of private facts, disclosure which would be objectionable to a reasonable person, and a lack of legitimate public interest in the information." *Fernandez-Wells v. Beauvais*, 983 P.2d 1006, 1008 (N.M.App. 1999). The element of publicity means that the information is "'made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge.'" *Id.* (quoting Restatement (Second) of Torts § 652D comment

a). The publicity element is not established if the defendant communicates "'a fact concerning the plaintiff's private life to a single person or even to a small group of persons.'" *Id.* (quoting Restatement (Second) of Torts § 652D comment a).

Plaintiff does not attempt to argue liability based upon widespread publicity, rather she seeks to invoke an exception to the publicity requirement. That exception is referred to as a "special-relationship" exception, which is "where the plaintiff and the 'public' receiving the private information enjoy a special relationship, disclosure may be actionable despite the lack of widespread publicity.'" *Id.* at 1009 (quoting *Miller v. Motorola, Inc.*, 560 N.E.2d 900, 903 (Ill. 1990)). "The purpose of the special-relationship exception, it seems, is to address circumstances in which the limited 'public' to which the disclosure is made is the portion of the public whose opinion matters most to the injured party – such as fellow employees, club members, church members, family or neighbors." *Id.* (quotation marks and citations omitted).

The special-relationship exception is not met based upon the disclosure made in this case. If the Court were to accept as true Woolworth's belief that he reasonably believed or was told he was speaking with a member of the BIA and analyze the special relationship exception in terms of Sully being with the BIA, that would support a finding that Plaintiff had a special relationship with Sully and BIA Superintendent Lake as they all would be working for the BIA on a geographically small Indian reservation that had a small population. There would be no special relationship with Chairperson Archambeau. There is a limitation to the special relationship exception for those persons with a "natural and proper interest" in knowing the information. *Roehrborn v. Lambert*, 660 N.E.2d 180, 183 (Ill.App. 1995). The New Mexico Court of Appeals used the natural and proper interest test in *Fernandez-Wells*, 983 P.2d at 1009, even though it did not expressly adopt that limitation. The BIA would have a natural and proper interest in knowing why its law enforcement officer could not complete federal law enforcement training. Thus, Plaintiff would not be entitled to the benefit of the special relationship exception to the publicity element for the separate reasons explained above.

If, on the other hand, the special relationship exception is analyzed by viewing Sully's true relationship with Plaintiff, Plaintiff did not have any special relationship with Sully or Chairperson Archambeau. Plaintiff was a BIA law enforcement officer and Sully was a tribal contract officer and they had no personal relationship. The New Mexico court also evaluated the relationship with persons the speaker could expect the information would be disclosed to. See *Fernandez-Wells*, 983 P.2d at 1009 (noting that "[a]ny expected disclosure would, at most, be to those with a reason to know within the offices of the Secretary of State and the Attorney General). In this case, it would be expected that Sully, as a tribal contracting officer, would disclose the information to the tribal chairperson, Archambeau. It would also be expected that Sully would disclose to BIA Superintendent Lake. Superintendent Lake is a co-employee of the Plaintiff on the reservation so with regard to Lake, the special relationship exception would apply except for the fact that as the BIA Superintendent on the reservation Lake would have a natural and proper interest in knowing the information. The analysis for Chairperson Archambeau is different. Archambeau and Plaintiff do not share a special relationship even though Plaintiff and Archambeau are enrolled members of the Yankton Sioux Tribe but Plaintiff was not an employee of the tribe nor did they have a personal relationship. Thus, there is no genuine issue of material fact remaining for trial. There is a dispute as to how Sully identified himself. No matter which side of the dispute is taken, the ultimate result is the same, albeit for different reasons. In the absence of a genuine issue of material fact on Plaintiff's invasion of privacy claim, Defendant United States is entitled to summary judgment on Plaintiff's FTCA claim. The Court recognizes that untruthful things were said by persons other than Woolworth and Sully about Plaintiff that damaged her, but the Defendant United States is not liable for those statements nor the grief and damage caused by the statements.

## II.     Privacy Act Claim

The Privacy Act provides that any disclosure of information covered by the Privacy Act is prohibited unless the individual whose information is disclosed authorizes it by prior written consent or one of the Act's exceptions authorizes the disclosure. *See* 5 U.S.C. § 552a(b). In this case, the Defendants admit Plaintiff did not provide written consent to disclose the information to Sully. In

8

addition, the Defendants do not contend a Privacy Act exception authorized the disclosure. Rather, Defendants contend that the information disclosed to Sully is not covered by the Privacy Act.

Section 552a(b) of the Privacy Act provides, with certain exceptions not applicable to the present case, that:

> No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written consent by, or with the prior written consent of, the individual to whom the record pertains[.]

Section 552a(g)(1)(D) provides in relevant part that:

> Whenever any agency ... (D) fails to comply with any provision of this section, or any rule promulgated thereunder, in such a way as to have an adverse effect on an individual, the individual may bring a civil action against the agency, and the district courts of the United States shall have jurisdiction in the matters under the provisions of this subsection.

If the provisions of section 552a(g)(1)(D) are met, the following relief is available to the individual authorized to bring a civil action:

> In any suit brought under the provisions of subsection (g)(1)(C) or (D) of this section in which the court determines that the agency acted in a manner which was intentional or willful, the United States shall be liable to the individual in an amount equal to the sum of –
> (A) actual damages sustained by the individual as a result of the refusal or failure, but in no case shall a person entitled to recovery receive less than the sum of $1,000; and
> (B) the costs of the action together with reasonable attorney fees as determined by the court.

5 U.S.C. § 552a(g)(4).

A "record" is defined under the Privacy Act as:

> [A]ny item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, his education, financial transactions, medical history, and criminal or employment history and that contains

>his name, or the identifying number, symbol, or other identifying particular assigned to the individual, such as a finger or voice print or photograph.

5 U.S.C. § 552a(a)(4).

The Eighth Circuit affirmed the dismissal of a Privacy Act claim where "the disclosure of information arose from the personal knowledge of an individual, and not from retrieval of information from a government report." *Olberding v. United States Dep't of Defense*, 709 F.2d 621, 622 (8th Cir. 1983). The Eighth Circuit affirmed the district court's rejection of the plaintiff's argument that "'section 552a(b) is violated if agency personnel disclose information they possess by means other than retrieval from a system of records if they know or have reasonable grounds to believe that the information may also be found in a record contained in a system of records.'" *Id.* The holding in *Olberding* was recently followed by the Eighth Circuit in *Hoffman v. Rubin*, 193 F.3d 959, 966 (8th Cir. 1999).

The Court finds *Olberding* governs the Privacy Act issues in this case and concludes that Defendants are entitled to summary judgment on Plaintiff's Privacy Act claim. There is no evidence in this case that Woolworth or Decoteau retrieved the information disclosed to Sully from a record. *See Hoffman*, 193 F.3d at 966 (holding that, "[i]n order to prevail under the Privacy Act, the information must have been contained in a system of records maintained by the [agency], and there is no evidence that [the agency official] obtained the information he disclosed from any [agency] record."). Decoteau did not participate in the investigation of Plaintiff, but he was orally informed of the circumstances of Plaintiff's misconduct by Training Sergeant LeBeaux, who was one of the officers that found Plaintiff in Vincent's room. Decoteau disclosed this information to Sully with Woolworth's permission. Thus, there is no genuine issue of material fact remaining for trial on Plaintiff's Privacy Act claim because the disclosure of information concerning Plaintiff's dismissal from the Academy arose from the personal knowledge of Decoteau from his conversation with LeBeaux and not from retrieval of information from a government report. *See Krieger v. Fadely*, 199 F.R.D. 10, 13 (D.D.C. 2001) (holding that under the Privacy Act, "there is a rule of retrieval, not a rule of coincidence. If there is information in a record, and a federal employee gained that

same information from the use of her own senses, the employee's telling others what she saw or heard does not violate the Privacy Act merely because there is a record, subject to the Privacy Act, which also contains that information."); *Thomas v. United States Dep't of Energy*, 719 F.2d 342, 345 (10th Cir. 1983) (holding that "'[t]here is no provision of the Privacy Act which prohibits providing information to a third party without prior consent of the subject which a federal official has acquired from personal observation or knowledge obtained from sources other than a record within the meaning of the Privacy Act.'").

Plaintiff contends Woolworth made an admission that the Privacy Act was violated and that summary judgment on liability should be granted in her favor based upon this admission. The alleged admission occurred during an internal affairs division investigation in March 2003. Woolworth was interviewed by BIA special agents on March 8, 2003. The transcript of this interview is attached to Plaintiff's Undisputed Facts In Support of Partial Summary Judgment, Doc. 36. In the interview, Woolworth was asked "Are you aware that it's possible, in discussing the issues regarding Jonelle Drapeau on the telephone, that that may have been a privacy act violation?" Woolworth's answer was "Yes." A formal letter of reprimand was issued on July 21, 2003, to Woolworth for authorizing the disclosure of the reasons for Plaintiff's dismissal from the Academy to Sully. Woolworth was demoted from his position as the Acting Chief of Training as a result of this disclosure of information to Sully.

Despite Plaintiff's claim to the contrary, neither Woolworth's statement during the internal investigation nor his internal disciplinary reprimand amount to an admission that there was a violation of the Privacy Act. The question Woolworth was asked in the internal interview was phrased in terms of a *possible* violation. Woolworth's answer acknowledged the possibility of a violation, but did not admit there was such a violation. In addition, there was no discussion of the elements of a Privacy Act violation in the interview or reprimand letter and there was no reference to Woolworth or Decoteau having retrieved the information released to Sully from an Academy record, as required for liability under the Privacy Act. Referring to the release of information to Sully by Decoteau, the reprimand letter stated, "[t]his unauthorized release of information was

11

revealed to tribal officials and others in Wagner, South Dakota, by the unidentified caller, thus violating the Privacy rights of that cadet." Whether Woolworth's actions violated the Privacy Act is a legal question and there is no indication that the Deputy Director of Operations who issued the reprimand letter is qualified to issue such a legal conclusion. Moreover, the Deputy Director of Operations' conclusion may have been sufficient to discipline Woolworth based upon the Academy's policies, but that conclusion does not automatically meet Plaintiff's burden to establish a Privacy Act violation in a court of law. While the reprimand states that Woolworth's actions "may cast a severe shadow on the integrity of the [Academy], as the cadet has hired legal counsel to deal with this matter[,]" the reprimand does not conclude that Woolworth's actions were intentional or willful, which is an additional requirement to establish liability for a Privacy Act violation. As there is no genuine issue of material fact that Woolworth or Decoteau retrieved the information disclosed to Sully from a record maintained in the Academy's system of records, neither Woolworth's statement during the internal investigation acknowledging the possibility of a Privacy Act violation, nor the internal reprimand issued to Woolworth entitle Plaintiff to summary judgment on her Privacy Act claim. Accordingly,

IT IS ORDERED:

1. That Defendants Motion for Summary Judgment, Doc. 38, is granted.

2. That Plaintiff's Motion for Partial Summary Judgment, Doc. 34, is denied.

Dated this 1st day of March, 2006.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK
BY: Sharon Suro
DEPUTY